IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JAMES P. HUBER and ARDELLA S. HUBER, | ) ) ) | 4:14CV3018 |
| Plaintiffs, | ) ) | MEMORANDUM |
| v. | ) ) | AND ORDER |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | ) ) ) ) ) | |
| Defendant. | ) | |

  Plaintiff, James P. Huber,[1] brings this action to contest a final administrative decision by the Commissioner of the Social Security Administration ("Commissioner" or "SSA") that he is not entitled to a waiver of recovery of overpayments for Social Security benefits that he received between November 2007 and August 2010, in the total amount of $63,318.00.[2] For the reasons discussed below, the Commissioner's decision will be affirmed.

*I. Statement of Facts and Procedural Background*

  Plaintiff applied for disability insurance benefits under Title II of the Social Security Act on July 28, 2006, alleging disability beginning January 27, 2006, due to organic mental disorders and affective mood disorders. *See* 42 U.S.C. §§ 416(i) & 423. SSA determined that Plaintiff became disabled on June 1, 2006, and was eligible for disability benefits beginning in November 2006, five calendar months after he became disabled. SSA stated that Plaintiff would receive $1,754.00 each month. The notice of award stated that it was Plaintiff's responsibility to let SSA know if he was

---

[1] Mr. Huber's wife, Ardella S. Huber, is also named as a plaintiff but does not have a direct interest in this matter.

[2] Plaintiff does not challenge the fact or amount of overpayment.

able to return to work.[3] SSA also cited two publications that Plaintiff could access about how work and earnings affect disability benefits.

In August 2007, Plaintiff filed a work activity report, stating that on November 13, 2006, he started full-time work as a laborer at BNSF. Plaintiff stated that he made $15.04 an hour at the start of his employment and was currently earning $15.89 an hour. In an internal SSA document, SSA acknowledged that Plaintiff timely reported his work activity. That same month, SSA responded to Plaintiff's information, stating "it appears we will decide that your disability ended because of substantial work [in] August 2007 and that you are not entitled to payments beginning November 2007" (Tr. 36). SSA's August 2007 letter explained that Plaintiff had an extended 36-month eligibility period that began immediately after his trial work period.[4] During the 36-month period, SSA would restart payment for any month that Plaintiff's work did not qualify as "substantial" if his health problems still met SSA's rules for disability eligibility. SSA stated that work qualified as substantial if the employee's gross monthly earnings averaged more than $860 in 2006 and $900 in 2007. SSA gave Plaintiff several telephone numbers and a web site address to use if he had any questions. Plaintiff's updated June 2011 earnings records showed that he earned $2,997.30 in 2006; $36,157.72 in 2007; $38,059.74 in 2008; $42,102.70 in 2009; and $45,283.43 in 2010.

---

[3] In his initial disability application, Plaintiff agreed to notify SSA if he went to work as an employee or a self-employed person.

[4] If an individual is receiving disability benefits, the regulations permit a trial work period without any reduction in the individual's benefits during the trial work period, which cannot exceed 9 service months. *See* 20 C.F.R. § 404.1592. Following a trial work period, an individual is eligible for a re-entitlement period. During the re-entitlement period, the individual will continue to receive disability benefits in any month (up to 36 months) when he does not engage in substantial and gainful work activity. *See* 20 C.F.R. § 404.1592a. If the individual does engage in substantial and gainful work activity, SSA will not pay benefits for that month. *See id.* The individual's re-entitlement period ends with the month he performs substantial gainful activity after the end of the 36-month re-entitlement period. *See id.*

In September 2007, SSA sent Plaintiff a cessation of benefits notice, stating that Plaintiff's eligibility ended in August 2007. That same month, SSA sent Plaintiff a notice of revised decision, stating that beginning November 2007, Plaintiff's disability ended and that Plaintiff was no longer entitled to payments. SSA noted that Plaintiff's payments had continued during a 9-month trial work period, which ended in July 2007. In keeping with the regulations, SSA continued to make payments for 2 months following the trial work period, through October 2007. SSA explained again that after Plaintiff's trial work period, he was entitled a to a 36-month extended period of eligibility during which SSA would restart payments for any months where Plaintiff's work was not substantial gainful activity and he continued to meet SSA's health rules. SSA told Plaintiff that "[b]ased on the information we have, your extended period of eligibility began August 2007 and will end after 36 months" (Tr. 44). The notice of revised decision again set out the 2006 and 2007 amount of earnings per month that indicated substantial gainful activity. The notice also mentioned the possibility of underpayment or overpayment that could be due and relisted contact information if Plaintiff had any questions.

Despite SSA's August and September 2007 communications to Plaintiff, both of which were from the Lincoln, Nebraska field office, SSA's Kansas City, Missouri processing center sent Plaintiff notice in November 2009 that SSA was increasing his monthly benefit amount to $1,983.00 beginning December 2009. The letter provided the usual contact numbers and web site information.

On August 30, 2010, SSA notified Plaintiff that it had paid him $65,281.00 more in benefits than he was entitled to from November 2007 through August 2010.[5] SSA asked Plaintiff either to pay the full amount or to contact SSA to schedule partial payment. In September 2010, Plaintiff responded, stating that the overpayment was not his fault and he could not afford to repay it. Plaintiff stated that he had "[n]ever

---

[5] The amount of overpayment was later reduced from $65,281.00 to $63,318.00 due to the return of Plaintiff's August 2010 Social Security payment.

received statement or letter of denial or termination of payment," but had "[r]eceived yearly notification of what monthly payment would be" and the "[e]xtended period of eligibility continued (letter 9-11-07)" (Tr. 54). Plaintiff listed assets of $100.00 in savings and two vehicles, with a combined value of $6,500.00. Plaintiff stated that he was employed at BNSF had monthly take home pay of $2,400.00. Plaintiff's spouse had $1,600.00 in monthly take home pay. Plaintiff listed their adjusted monthly household expenses as $3,930.00.

In March 2011, SSA informed Plaintiff that it would not waive the collection of the overpayment. SSA noted that Plaintiff had continued to receive his Social Security disability payments while working full time and had not provided SSA with any earnings information after 2007. Although Plaintiff asserted that he assumed SSA had all of his earnings information from the Internal Revenue Service, and that he believed he had 3 years to receive benefits and work at the same time, SSA did not consider these valid reasons for waiving the overpayment. In April 2011, SSA sent a new letter to Plaintiff communicating its reasoning and decision not to waive the overpayment. SSA explained to Plaintiff: "You accepted payments that you were expected to know were incorrect. The Social Security Administration does not pay monthly disability checks to individuals [who] are working full time" (Tr. 87).

In July 2011, Plaintiff responded that he believed SSA sent him the payments during the disputed time to see if he would be able to maintain employment. Plaintiff stated that he has difficulty maintaining focus and that he never thought that SSA was overpaying him. Plaintiff estimated his adjusted monthly expenses at $4,095.00.

Plaintiff requested and was granted a hearing before an ALJ. SSA informed Plaintiff of his right to representation, but Plaintiff elected to represent himself at the hearing, which was held on February 22, 2012.

Plaintiff testified that he recalled being approved to receive benefits beginning in November 2006 and that he did, in fact, receive the benefits. Plaintiff testified that

after he began receiving benefits, he started working for BNSF in November 2006, working 40 hours a week and making $15.04 an hour. Plaintiff agreed that he was working at the same time he received benefits and that he had reported his work activity to SSA in August 2007. Plaintiff stated he believed that once he qualified for benefits, he could receive benefits for 36 months while he worked.

Plaintiff's wife also testified at the hearing. She referred to the September 11, 2007 notice in which the SSA stated that Plaintiff's "extended period of eligibility began August 2007 and will end if substantial work is performed after 36 months following this date" (Tr. 44), and testified: "This is why we thought we were entitled or would continue to receive the benefits for a period of time regardless of Jim's ability to work, because we thought that 36 months was a trial period to see if he could maintain a job at his mental capacity" (Tr. 162).

Ms. Huber further noted that SSA knew Plaintiff was working at BNSF and had been informed by Plaintiff almost a year after he started working that he did not need Medicare because he had health insurance with BNSF. She testified Plaintiff received a letter from SSA stating that his benefits would be increased because he declined Medicare benefits, and that he received another letter in November 2009 stating that his benefits would again be increased. In response to questioning by the ALJ, Ms. Huber testified they were not concerned about the fact that usually $900.00 in wages indicated substantial work, because they thought their circumstances fell outside the usual circumstances. She noted that they always reported the Social Security disability payments to the IRS. Given these reasons, Ms. Huber believed Plaintiff was without fault in receiving the overpayments. She stated that they were also asking for a waiver because they did not have the ability to repay.

In his March 19, 2012 decision, the ALJ found that Plaintiff "was not without fault" in causing the overpayment under the regulations, 20 C.F.R. §§ 404.506(a), 404.507, and 404.510a, and that Plaintiff must remit the amount of overpayment to SSA. The ALJ found that the notices SSA sent to Plaintiff about the cessation of his

benefits and the amount that usually constitutes substantial gainful activity were "in no way misleading or ambiguous. . ." (Tr. 17). The ALJ also noted that if Plaintiff was uncertain about the effect of his return to work on his eligibility for benefits, he reasonably should have contacted SSA for clarification.

The Appeals Council denied Plaintiff's request for review on December 5, 2013. Plaintiff filed his complaint in this court on January 23, 2014.

*II. Discussion*

The court reverses the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *See Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012) (citing 42 U.S.C. §405(g)). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.* In determining whether evidence is substantial, the court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Id.* If substantial evidence supports the Commissioner's conclusions, the court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome. *Id.*

The amount of overpayment is the difference between the amount paid to the overpaid individual and the amount of payment to which the individual was actually entitled. 20 C.F.R. § 404.504. SSA will adjust the amount of recovery or waive the overpayment if the claimant is without fault and adjustment or recovery would defeat the purpose of the Act, or recapture would be against equity and good conscience. *See* 20 C.F.R. § 404.506(a).

Even if SSA was at fault in making the overpayment, this fact will not relieve or ameliorate the fact that an individual must repay the overpayment. The "not without fault" standard for relief from an overpayment applies solely to the individual receiving the overpayment. *See* 20 C.F.R. § 404.507.

In deciding fault, the fact finder is required to consider all of the claimant's circumstances, including age, intelligence, education, and physical and mental condition. *See* 20 C.F.R. § 404.507. An individual is at fault if the overpayment resulted from his acceptance of a payment that the recipient either knew, or could have been expected to know, was incorrect. *See* 20 C.F.R. § 404.507(c). An individual cannot meet the "not without fault" standard if the evidence shows the individual exercised either a lack of good faith or failed to exercise a high degree of care in determining whether he should bring to SSA's attention circumstances that might cause deductions from his benefits. *See id.* Only after an individual has established that he is without fault does the Commissioner consider whether recovery of the overpayment would defeat the purpose of Title II of the Act or would be against equity and good conscience under Title II of the Act. *See* 20 C.F.R. §§ 404.506(a), (b); 404.507-09.

When SSA errs in making a disability benefit payment, SSA is entitled to recover the money unless the recipient was without fault and recovery would subvert the purpose of Social Security or be against equity and good conscience. *See Rodysill v. Colvin*, 745 F.3d 947, 949 (8th Cir. 2014) (citing 42 U.S.C. §404(b)). On the "without fault" and "equity and good conscience" issues, the individual who has received the overpayment bears the burden of proof. *See id.*

The "without fault" inquiry focuses on what the recipient himself should have known. *See Coulston v. Apfel*, 224 F.3d 897, 899 (8th Cir. 2000) (citing 20 C.F.R. § 404.507). The ALJ is required to take into account the individual's mental or educational limitations. *Id.* at 898 (citing 42 U.S.C. § 404(b)). The ALJ may also consider documented communications between the recipient and SSA about the amount in question. *See id.*

If an individual accepts overpayments because he relied on erroneous information from an official source within the SSA with respect to an interpretation of the Act or a regulation, the individual accepting the overpayment will be deemed

to be without fault. *See Gladden v. Callahan*, 139 F.3d 1219, 1223 (8th Cir. 1998) (citing 20 C.F.R. § 404.510a). If the individual meets the requirements set out in § 404.510a, recovery is automatically waived because it is deemed to be against equity and good conscience. *See id.*

If misinformation from SSA is not the issue, and if the recipient establishes that he is without fault, then the fact finder determines whether repayment would defeat the purpose of providing benefits to the recipient or would be against equity and good conscience. *See Coulston*, 224 F.3d at 900-01 (citing 42 U.S.C. § 404(b)). Recovery of overpayment would defeat the purpose of Title II of the Act if it would deprive a person of income required for ordinary and necessary living expenses. *See* 20 C.F.R. § 404.508(a). Recovery is against equity and good conscience if the person has changed his position for the worse or relinquished a valuable right through no fault of his own. *See Wiles v. Colvin*, Nos. 4:13-CV-3014, 4:13-CV-3063, 2014 WL 1365902, *5 (D.Neb. April 7, 2014); 42 U.S.C. § 404(b); 20 C.F.R. § 404.509.

In Plaintiff's case, the ALJ did not reach the issues of whether repayment would be against equity and good conscience because the ALJ determined that Plaintiff was "not without fault" in receiving the payments. The ALJ made this determination because Plaintiff received two separate notices from SSA about his work review and continued eligibility that "appear to be quite clear and concise in stating [Plaintiff's] ongoing ineligibility for benefit payments and the effect of his work with regard to his continued eligibility" (Tr. 16, citing Tr. 36-39, 44-46). Furthermore, SSA gave Plaintiff the gross average earnings amounts that indicated ineligibility for benefits and Plaintiff's gross monthly income well exceeded these amounts (Tr. 17, 100).

The ALJ found Plaintiff's justifications for waiver not persuasive or credible given the clarity of SSA's communications with Plaintiff, which provided definitions of terms of art, a clear explanation of the effect of SSA's determination on Plaintiff's benefits, and specific information for Plaintiff to contact SSA if he had any questions

about his eligibility[6] (Tr. 17, 36-39, 44-46). The fact that Plaintiff received disability benefits after notifying the Commissioner of work activity does not satisfy the waiver requirements. See *Rodysill*, 745 F.3d at 952 (citing 20 C.F.R. § 404.510a).

The ALJ also addressed the impact of Plaintiff's mental state on the issue of overpayment, given the fact that Plaintiff qualified for disability due to a mental limitation. The ALJ found that "there is no evidence that the claimant would have been mentally compromised to the point that he was incapable of understanding the basic principles as contained in the notices, particularly that the notice plainly stated that his payments would end effective with November 2007" (Tr. 17). Given the fact that SSA provided him the information "in a distinctly straightforward manner, he continued to accept payments that he either knew, or could have been expected to know, were incorrect" (Tr. 18).

In his brief, Plaintiff contends he cannot repay SSA because he lost his job with BNSF on October 10, 2013, and Ms. Huber lost her job on November 5, 2013, and neither of them have since been able to secure full time employment. Plaintiff also states that he is being treated for mental health concerns and is unable to concentrate on daily activities. Plaintiff renews his request for waiver due to these changed circumstances, but evidence that does not relate to the time at issue before the ALJ is not a material basis for remand or relevant. See *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997).

### III. Conclusion

In summary, the ALJ fully investigated Plaintiff's claims and then correctly analyzed the law and the facts. The ALJ made a substantially supported finding that

---

[6] Even though the ALJ considered Ms. Huber's comments, it is what Plaintiff knew or should have known, not his wife's knowledge, that is relevant. See *Coulston*, 224 F.3d at 899.

Plaintiff was "not without fault" in causing the overpayment and therefore was liable for the overpayment. Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

August 15, 2014.                                  BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.